104 Ark.App. 215

**Louis C. SCHMOLL, Elizabeth A. Schmoll, Appellants,**

**v.**

**HARTFORD CASUALTY INSURANCE COMPANY d/b/a "The Hartford"; Ronny Kisner d/b/a Circle K; and William E. Cole, Appellees.**

**No. CA 08–175.**

Court of Appeals of Arkansas.

Dec. 31, 2008.

Rehearing Denied Feb. 11, 2009.

42

Bart F. Virden, Morrilton, for appellants.

Wright, Lindsey & Jennings, LLP, by: Claire Shows Hancock, and Kyle R. Wilson, Little Rock, for appellee Hartford Casualty Insurance Co.

Cahoon & Smith, by: David W. Cahoon, Jonesboro, for appellees Ronny Kisner d/b/a Circle K and William E. Cole.

JOHN MAUZY PITTMAN, Chief Judge.

This case arises from an accident involving a tractor-trailer transporting cattle. The issues involve who is responsible for the burial of cattle killed in the accident on property owned by appellants Louis and Elizabeth Schmoll. The Schmolls assert that appellees Hartford Casualty Insurance Company; Ronny Kisner, d/b/a Circle K; and William Cole are responsible. The Conway County Circuit Court granted summary judgment in favor of Hartford, Kisner, and Cole.[1] The Schmolls appeal. We affirm.

---

1. The Schmolls also named Johnny Smith and Lloyd Elkins, Jr., as defendants. After the

On December 17, 2002, Cole was driving a tractor-trailer owned by Kisner. Cole was transporting cattle when he allegedly fell asleep and wrecked. Several cattle were killed, others escaped. Hartford was Kisner's insurance company. After the accident, Johnny Smith made provisions for the safe-keeping of the surviving cattle and for the disposal of the dead cattle. Smith took the surviving cattle to the stockyards operated on property owned by the Schmolls. Lloyd Elkins, acting at Smith's direction, proceeded to bury the dead cattle in a shallow pit on the Schmolls' property. Approximately three months later, the Schmolls discovered that the cattle had been buried on their property.

The Schmolls filed suit on December 22, 2003, asserting theories of trespass and negligence for the burial of the cattle on their property without permission. They alleged that Kisner and Cole were responsible for the cleanup of the accident proximately caused by their negligence in the operation of the truck. They also asserted that Smith was acting as an employee or agent of Hartford when he directed Elkins to bury the cattle. As damages, the Schmolls sought the amounts they spent to clean up their property and for damages to their business.

Kisner and Cole filed an answer in which they admitted that Cole was employed by Kisner but denied that Cole had caused the accident. They later filed a motion for summary judgment in which they asserted that the accident merely provided the conditions or occasion for subsequent events to become the proximate cause of the Schmolls' damages and that the actions of Smith and Elkins were the efficient and intervening cause of the damages suffered by the Schmolls.

Hartford's answer denied the material allegations of the complaint. Hartford also moved for summary judgment, arguing that the only connection it had with the case was the issuance of a policy to Kisner and that there was no proof that Smith or Elkins were acting as its agents.

According to Johnny Smith's deposition testimony, the police dispatcher told him that an eighteen-wheeler had turned over and that they needed a truck and trailer to help haul cattle. When Smith arrived at the scene, it appeared that state trooper Mark Brice was in charge. Smith said that he began loading up the live cattle on his trailer, and then took them to a stockyard lot owned by the Schmolls. Smith testified that no one told him to take the cattle there, and he also admitted that he did not call the Schmolls to request permission. Smith said that he told Lloyd Elkins to take the dead cattle behind Paul Russell's garage and bury them in a hole Elkins was to dig.

Smith further testified that, while he was at the scene of the accident, an employee of Hartford called him and inquired how many cattle, living and dead, there were. Smith told the Hartford representative that he had secured the live cattle at the stockyards. Smith said that Hartford did not offer any instructions to him about what to do with the live cattle or in the disposal of the dead cattle. Smith said that he assumed that he was hauling the cattle for Hartford. Everyone working on the cleanup submitted bills to Smith, who, in turn, submitted them to Hartford. Hartford sent Smith a check and he disbursed it to the proper people.

Lloyd Elkins testified that he was contacted by either the Arkansas State Police

circuit court granted summary judgment to the other defendants, the Schmolls nonsuited their claims against Smith and Elkins. A separate order dismissing the claims against Smith and Elkins without prejudice was entered.

or Paul's Wrecker Service. The caller told Elkins to bring his dump truck and back-hoe to help load the dead cattle. When Elkins arrived at the scene, state trooper Mark Brice told him to take all of the dead cattle to the stockyards and dump them there. Elkins did as Brice instructed, making two trips to haul thirty-eight dead cattle. Elkins testified that Hartford did not give him any instructions with regard to disposal of the dead cattle. Elkins said that he believed that he was working for Smith. He also said that neither Kisner nor Cole, nor anyone from Hartford gave him instructions.

In his deposition, Louis Schmoll testified that the only proof he had that Smith was Hartford's agent in the disposal of the cattle was that Hartford paid Smith. Schmoll also did not have any proof that either Kisner or Cole directed or con-trolled the salvage operation, including the disposal of the dead cattle, following the accident. Likewise, he did not have any proof that Hartford directed either Smith or Elkins to bury the cattle on his land other than Smith's testimony about tele-phone calls from a Hartford representa-tive.

On October 26, 2005, the motions for summary judgment were denied. On April 16, 2007, Kisner and Cole filed a motion for summary judgment as to damages and moved for reconsideration of their previous motion. The basis for the motion was that further discovery had revealed that the damages the Schmolls alleged that they had suffered were actually damages to two corporate entities owned by the Schmolls and that the statute of limitations had run on those claims because the Schmolls lacked standing to bring suit on behalf of the corporate entities. Hartford filed a similar motion and also asserted that there was no proof of actions on Hartford's part

that would establish that Smith and Elkins were acting as its agents.

In response, the Schmolls asserted that they did have standing because they owned the land leased to the corporate entities and that they had a vested interest in any income lost by the corporations. In addition, the Schmolls sought to amend their complaint to assert claims on behalf of the corporate entities. They alleged that the defendants would not suffer any prejudice as a result of the amendment. Hartford, as well as Kisner and Cole, filed motions to dismiss the Schmolls' amended complaint, asserting that the statute of limitations had already run on the corpora-tions' claims.

The circuit court held a hearing on the motions for summary judgment and mo-tions to dismiss the amended complaint on May 14, 2007. The court found that there was no proof as to the damages the Schmolls suffered as individuals. The court also found that the statute of limita-tions had run as to any claims the corpo-rate entities may have had. Finally, the court found no proof that Smith or Elkins were agents of Hartford. Accordingly, summary judgment was granted to the defendants. The court further found that there was no issue of material fact as to whether Kisner and Cole were the proxi-mate cause of the Schmolls' individual claims. The court's written order was filed on October 15, 2007. On November 6, 2007, the court issued an amended order that set forth the above findings and also contained a Rule 54(b) certification as a final order for purposes of appeal. This appeal followed.

We will approve the granting of a mo-tion for summary judgment only when the state of the evidence as portrayed by the pleadings, affidavits, discovery responses, and admissions on file is such that the nonmoving party is not entitled to a day in

court, *i.e.*, when there is not any genuine remaining issue of material fact and the moving party is entitled to judgment as a matter of law. *Cumming v. Putnam Realty, Inc.*, 80 Ark.App. 153, 92 S.W.3d 698 (2002). The burden of proving that there is no genuine issue of material fact is upon the movant, and all proof submitted must be viewed favorably to the party resisting the motion. *Id.* On appellate review, we determine if summary judgment was proper based on whether the evidence presented by the movant left a material question of fact unanswered. *Id.*

The Schmolls raise two points, challenging the award of summary judgment to Kisner and Cole in the first point, and the summary judgment in favor of Hartford in the second point. In both points, they argue that jury questions were created, making summary judgment inappropriate.

■ The first issue is whether the negligence of Kisner and Cole in causing the accident was the proximate cause of the injuries the Schmolls suffered when Smith and Elkins buried the dead cattle on their property. Louis Schmoll testified that he did not suffer any damages from the accident itself; instead, his damages stemmed from the burial of the dead cattle on his property. Proximate causation is an essential element for a cause of action in negligence. *Clark v. Ridgeway*, 323 Ark. 378, 914 S.W.2d 745 (1996). When a party cannot present proof on an essential element of his claim, the moving party is entitled to summary judgment as a matter of law. *Sanders v. Banks*, 309 Ark. 375, 830 S.W.2d 861 (1992); *see also Bushong v. Garman Co.*, 311 Ark. 228, 843 S.W.2d 807 (1992). Although proximate causation

is usually a question of fact for a jury, where reasonable minds cannot differ, a question of law is presented for determination by the court. *Cragar v. Jones*, 280 Ark. 549, 660 S.W.2d 168 (1983).

■ To accept the Schmolls' argument that the mere timing of these events established a causal connection, we would have to engage in reasoning based on a logical fallacy known as post hoc ergo propter hoc, meaning "after this and therefore because of this." *Sunward Corp. v. Dun & Bradstreet, Inc.*, 811 F.2d 511, 521 n. 8 (10th Cir.1987). This fallacy confuses sequence with consequence, and assumes a false connection between causation and temporal sequence. Post hoc ergo propter hoc is not sound as either evidence or argument. *Wirth v. Reynolds Metal Co.*, 58 Ark.App. 161, 947 S.W.2d 401 (1997).[2]

Here, it might be foreseeable that Kisner and Cole would have an accident leading to the death of the livestock that they were transporting. It might also be foreseeable that any surviving animals would have been taken to the Schmolls' property because it was the location of a stockyard and sale barn. However, it would stretch foreseeability to say that Kisner and Cole should have anticipated that someone over whom they had no control would improperly dispose of dead animals by burying them in a shallow pit on another person's property without the landowner's knowledge or consent. *See Ethyl Corp. v. Johnson*, 345 Ark. 476, 49 S.W.3d 644 (2001). Because the Schmolls cannot present evidence of a crucial element of their case, the circuit court correctly granted summary judgment to Kisner and Cole.

---

**2.** We are mindful that our supreme court criticized *Wirth* and called its viability into doubt in *Wallace v. Broyles*, 331 Ark. 58, 961 S.W.2d 712 (1998). The *Wallace* court's criticism of *Wirth* had to do with the supreme court's belief that we applied an incorrect standard of review. *Wallace*, however, did not address whether post hoc ergo propter hoc was sound reasoning. It is not.

■ In their second point, the Schmolls argue that the circuit court erred in granting summary judgment to Hartford because there were factual issues of agency to be decided. The argument is that it is for the jury to determine whether there was a master-servant relationship between Hartford and Smith so as to impose liability upon Hartford.

■ The relation of agency is created as the result of conduct by two parties manifesting that one of them is willing for the other to act for him subject to his control and that the other consents to so act. *Sterne, Agee & Leach, Inc. v. Way*, 101 Ark.App. 23, 270 S.W.3d 369 (2007). Neither agency nor the extent of an agent's authority can be shown by his own declarations in the absence of the party to be affected. *Dixie Ins. Co. v. Joe Works Chevrolet, Inc.*, 298 Ark. 106, 766 S.W.2d 4 (1989); *Zullo v. Alcoatings, Inc.*, 237 Ark. 511, 374 S.W.2d 188 (1964). The burden of proving an agency relationship lies with the party asserting its existence. *Newberry v. Scruggs*, 336 Ark. 570, 986 S.W.2d 853 (1999).

Here, all of the factors that the Schmolls claim indicate a master-servant relationship come from Smith's testimony. In fact, Smith only assumed that he was working for Hartford. There is no evidence that Hartford ever directed Smith in the disposal of the cattle. The fact that Hartford directed Smith to submit bills for the cleanup does not indicate an agency relationship or that Hartford controlled Smith's actions in the disposal of the cat-

tle. Neither does the fact that Hartford paid Smith and he, in turn, disbursed the money to others. Hartford was obligated under its policy with Kisner to make payments for safeguarding the surviving animals and disposal of the dead animals. Further, it was not Hartford that asked Smith to assist with the cleanup; rather, it was law enforcement that called him out to the scene. According to Smith's deposition testimony, it was trooper Brice who asked him to get the cattle off of the truck. The fact that Smith did so did not later transform him into Hartford's agent when Hartford made inquiries to ascertain the scope of a loss that it was obligated to pay.

To hold that a factual question is presented because of Smith's actions would mean that Smith was Hartford's agent simply because he acted as such. However, it is the actions and words of the principal, Hartford, that create the agency and must be traced to that source. *See Standard Mut. Ben. Corp. v. State*, 197 Ark. 333, 122 S.W.2d 459 (1938). Louis Schmoll testified that he had no proof, other than Smith's actions and Hartford's payment, that Hartford controlled or directed Smith in the disposal of the dead cattle. Therefore, summary judgment for Hartford was proper.[3]

Affirmed.

GLADWIN, ROBBINS, MARSHALL, VAUGHT, and HEFFLEY, JJ., agree.

HART, BAKER, and HUNT, JJ., dissent.

---

3. The dissent would, in effect, dispense with the legal requirement of proximate causation by permitting the jury to find that negligent operation of a motor vehicle by one party was the cause of the trespass committed at another time and place by another party. This amounts to nothing more than but-for causation. No reasonable person could have anticipated on this record that disposal of the carcasses would result in a trespass upon the Schmolls' property, and the trespass was therefore an intervening cause as a matter of law. In any event, the Schmolls have utterly failed to show that the insurer in this case had any duty to supervise the removal of the carcasses or any foreknowledge that reasonably could impose such a duty.

KAREN R. BAKER, Judge, dissenting.

The improper merging and application of the concepts of foreseeability, intervening cause, vicarious liability, and apparent authority in the majority's reasoning leads it to affirm the summary judgments in this case when proper application of the law requires reversal. The state of the evidence as portrayed by the pleadings, affidavits, discovery responses, and admissions on file indicate that the Schmolls are entitled to their day in court, and we should reverse the grant of summary judgment.

The majority reasons that "the Schmolls cannot present evidence of a crucial element of their case" because "it would stretch foreseeability to say that Kisner and Cole should have anticipated that someone over whom they had no control would improperly dispose of dead animals by burying them in a shallow pit on another person's property without the landowner's knowledge or consent." This reasoning is clearly wrong on many levels. The majority merges and confuses three distinct concepts: (1) the foreseeability of the possible harm caused by the asserted improper disposal of the animal carcasses; (2) the doctrine of intervening cause; (3) the vicarious liability of a principal for an agent's tortious conduct.

To prove negligence in Arkansas, the plaintiff must show a failure to exercise proper care in the performance of a legal duty which the defendant owed the plaintiff under the circumstances. *Shannon v. Wilson,* 329 Ark. 143, 947 S.W.2d 349 (1997). This concept of exercising proper care includes the element of foreseeability. As our supreme court has explained: "[t]o constitute negligence, an act must be one from which a reasonably careful person would foresee such an appreciable risk of harm to others as to cause him not to do the act, or to do it in a more careful manner." *Ethyl Corp. v. Johnson,* 345 Ark. 476, 481, 49 S.W.3d 644, 648 (2001) (quoting *Wallace v. Broyles,* 331 Ark. 58, 961 S.W.2d 712 (1998)). However, a defendant is under no duty to guard against risks it cannot reasonably foresee. *Ethyl Corp.,* 345 Ark. at 481, 49 S.W.3d at 648. In analyzing the issue of foreseeability, however, the question is not whether a defendant could have reasonably foreseen the exact or precise harm that occurred, or the specific victim of the harm. *See Wallace v. Broyles, supra.* It is only necessary that the defendant be able to reasonably foresee an appreciable risk of harm to others. *Id.*

Duty is a concept that arises out of the recognition that relations between individuals may impose upon one a legal obligation for the other. *Tackett v. Merchant's Security Patrol,* 73 Ark.App. 358, 362, 44 S.W.3d 349, 352 (2001). Ordinarily, a person is under no duty to control the actions of another person, even though he has the practical ability to do so. *Id.* One is not liable for the acts of another person unless a special relationship exists between the two. *Id.* The question of what duty is owed to the plaintiff is always one of law. *Id.*

While the question of what duty is owed is one of law, the determination of the nature of the relationships arises from the facts of the situation. In the case before us, the Schmolls alleged in their complaint that Cole, who was an employee of Kisner, caused a wreck that resulted in the death of cattle. They further alleged that each of the defendants was "under a duty to take particular care to properly dispose of the dead animals" and that each "had a duty and responsibility to ensure that the cattle were properly disposed of." Their complaint specifically references Arkansas statutory law and regulations providing for the disposal of dead cattle. While viola-

tion of a law does not constitute negligence per se, it is evidence of negligence. *Young v. Dodson*, 239 Ark. 143, 388 S.W.2d 94 (1965).

The Schmolls claimed that the defendants' negligence in failing to properly dispose of the carcasses resulted in economic damages which, in addition to the physical damage to their property caused by the initial digging of the pit and subsequent removal of the decaying carcasses, included the closing of their businesses of the livestock auction and the restaurant on the site of the auction. They asserted that the improper disposal and its discovery caused severe damage to their business reputation, which resulted in these closures.

In response to the Schmolls' allegation that Mr. Smith had made arrangements with Hartford, as the insurer and agent for Cole and/or Kisner, for the safekeeping of live animals and to dispose of the deceased animals, Mr. Smith admitted that he had made such an arrangement. Mr. Smith also affirmatively stated in his answer that not only were the Schmolls informed that the animals were buried on the Schmolls' property the day after they were buried, but he had also disposed of dead cattle on Schmolls' premises in the past with the consent of the Schmolls. Kisner, Cole, and Hartford denied the allegations.

Mr. Elkins admitted in his answer that he was the one who buried the carcasses; however, he specifically denied Schmoll's allegations that he had buried the animals in a shallow grave using only nine to twelve inches of soil to cover the remains. Rather, he affirmatively stated that he had used at least two feet of dirt to bury the cattle. His reference to the two feet of cover is consistent with paragraph two of the Arkansas Livestock and Poultry Commission's regulation for the disposal of large animal carcasses requiring that all carcasses are to be covered with at least two feet of dirt. Arkansas Code Annotated section 2–40–1302 (Repl.2008) requires that all large animal carcasses be disposed of pursuant to these regulations. Kisner, Cole, and Hartford answered that they were without sufficient information to form a belief as to the allegations of the improper burial.

A review of these pleadings demonstrates a factual dispute as to whether Mr. Elkins followed the regulations regarding the disposal of carcasses, *see Young v. Dodson*, 239 Ark. 143, 388 S.W.2d 94 (1965) (recognizing that violation of a law does not constitute negligence per se but is evidence of negligence), whether a trespass occurred, and whether Hartford, acting as the agent for Kisner and Cole, employed Mr. Smith to dispose of the carcasses that Mr. Elkins buried, *see Tackett v. Merchant's Security Patrol, supra* (holding that a duty of care may arise out of a contractual relationship between two parties). A factual dispute exists as to the relationship of the individuals which necessarily affects their respective duties.

Because the Schmolls' negligence claim was based upon the failure to properly dispose of the dead cattle, this court's analysis of the duty must focus on the foreseeability of the harm caused by the improper disposal of the carcasses. First, not only was the possibility of the death of livestock in the event of an accident foreseeable, the loss and the disposal of the carcasses were specifically provided for in the contract between Kisner and Hartford. Significantly, the contract stated, "Unless we [Hartford] give our permission, you may not dispose of the carcass(es) of the Covered Livestock until we inspect or examine such carcass(es). But, this clause does not apply if such disposal is required by law or ordinance."

Arkansas Code Annotated § 8–6–205(4) (Supp.2007) states that it shall be illegal

for anyone to "in any manner leave or abandon any solid wastes ... upon any public highway, street, road ... or other public property...." Kisner and Cole could not merely leave or abandon the carcasses on public property without incurring liability. Each had a duty to neither leave nor abandon the carcasses. To the extent that the majority references a purported instruction by Trooper Brice regarding the disposal of the carcasses, no party alleged nor does the majority hold that Kisner or Cole were relieved of this duty, as the owner of the cattle and employee of the owner respectively, regarding the carcasses merely because the trooper was performing his duties regarding public safety of the highway.

Kisner, and Cole as his employee who caused the death of Kisner's cattle on the road, had a duty to remove the carcasses from the public property and to dispose of the carcasses properly pursuant to Arkansas statutory and regulatory laws. The fact that they left the scene and did not specifically direct the removal and disposal does nothing to relieve them of that responsibility. Neither can their lack of personal involvement affect the foreseeability that the failure to properly dispose of the dead cattle would cause harm. The rules and regulations of the Arkansas Livestock and Poultry Commission were promulgated to prevent such harm by the improper disposal of livestock. Neither the identity of the specific victim of the harm nor the nature of the specific harm is required to meet the foreseeability prong of a negligence claim. *See Wallace, supra.* Accordingly, Kisner and Cole had a legal duty to properly remove and dispose of the carcasses.

The majority appears to merge the concept of foreseeability as it relates to the Schmolls' claim for damages arising from the negligent disposal with the Schmolls' claim for damages arising from the trespass. The majority's reference to the foreseeability of the trespass suggests it views the alleged trespass as an intervening cause. Even if the factual dispute as to the Schmolls' knowledge and consent resulted in a finding that a trespass occurred, the trespass is irrelevant to the claim that the burial was done in a negligent manner. On the issue of whether or not there was an efficient intervening cause, this question is "simply ... whether the original act of negligence or an independent intervening cause is the proximate cause of an injury. Like any other question of proximate causation, the question whether an act or condition is an intervening or concurrent cause is usually a question for the jury." *Hill Constr. Co. v. Bragg,* 291 Ark. 382, 385, 725 S.W.2d 538, 540 (1987) (quoting from *Larson Machine v. Wallace,* 268 Ark. 192, 600 S.W.2d 1 (1980)); *see also Graftenreed v. Seabaugh,* 100 Ark.App. 364, 268 S.W.3d 905 (2007).

Proximate cause is defined, for negligence purposes, as that which in a natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury, and without which the result would not have occurred. *Wal–Mart Stores, Inc. v. Kilgore,* 85 Ark.App. 231, 148 S.W.3d 754 (2004). The *Bragg* court went on to explain the independent effect of the intervening agent:

> original act or omission is not eliminated as a proximate cause by an intervening cause unless the latter is of itself sufficient to stand as the cause of the injury. The intervening cause must be such that the injury would not have been suffered except for the act, conduct or effect of the intervening agent *totally independent* of the acts of omission constituting the primary negligence.

*Bragg,* 291 Ark. at 385, 725 S.W.2d at 540 (emphasis added).

The burial of carcasses is dependent upon the act that created the need for the burial of the dead cattle—the accident in which they were killed, not the trespass. The improper burial caused the damages to the Schmolls. The alleged trespass is not the cause of the improper burial. The fact that the Schmolls became the specific victims of the negligent burial may be directly traceable to a trespass, if the fact-finder concludes that Smith and Elkins did not have permission to bury the cattle on the Schmolls' property. However, the fact that a trespass may have occurred only provides the factual explanation as to how the Schmolls became the specific victims, and the foreseeability of the Schmolls as the victims is not required. *See Wallace, supra.* Any trespass committed during the disposal of the carcasses cannot eliminate the negligence that resulted in the death of the cattle and the improper disposal of the dead livestock which led to the damages suffered by the Schmolls. The timing of the trespass cannot in and of itself interrupt the natural and foreseeable consequences flowing from the death of the livestock and the need for the proper disposal of the carcasses.

The majority further contorts its analysis in its failure to explain the relevance of its inclusion of the phrase, "someone over whom they had no control" in its foreseeability pronouncement. The phrase has relevance in a negligence context in the doctrine of vicarious liability of a principal for its agent's tortious conduct when the agent is an independent contractor. However, even the question of whether an agent is an independent contractor is fact intensive in nature. An independent contractor is one who contracts to do a job according to his own method and without being subject to the control of the other party, except as to the result of the work. *Arkansas Transit Homes, Inc. v. Aetna Life & Cas.,* 341 Ark. 317, 16 S.W.3d 545

(2000); *Howard v. Dallas Morning News, Inc.,* 324 Ark. 91, 918 S.W.2d 178 (1996). One who employs an independent contractor is generally not liable for the torts of the contractor committed in the performance of the contracted work. *Stoltze v. Arkansas Valley Elec. Co-op. Corp.,* 354 Ark. 601, 127 S.W.3d 466 (2003); *Blankenship v. Overholt,* 301 Ark. 476, 786 S.W.2d 814 (1990). However, when the employer goes beyond certain limits in the directing, supervising, or controlling the performance of the work, the relationship changes to that of employer-employee, and the employer is liable for the employee's torts. *Blankenship v. Overholt, supra.* Because there is no fixed formula for determining whether an entity is an employee or an independent contractor, the determination must be made based on the particular facts of each case. *Arkansas Transit Homes, Inc. v. Aetna Life & Cas., supra.*

The particular facts of this case demonstrate the fact intensive nature of agent and principal tort liability. Any implication that Kisner and Cole could not possibly be liable because they had no control is untenable under the disputed facts of this case and their responsibility to properly dispose of the carcasses pursuant to Arkansas statutory and regulatory law. Therefore, the trial court erred in granting summary judgment to Kisner and Cole, and the majority errs in affirming that summary judgment. The mixing of the concepts of foreseeability, the doctrine of intervening cause, and the vicarious liability of a principal for an agent's tortious conduct lead the majority to the wrong conclusion.

The majority's improper merger of legal concepts also distorts its analysis of the relationship between Hartford and Smith and whether the relationship was one of principal and agent. The majority relegates Smith's testimony indicating the

agency relationship as having no weight. It reasons that "[n]either agency nor the extent of an agent's authority can be shown by his own declarations in the absence of the party to be affected."

This statement of the law is a reference to the doctrine of apparent authority. The doctrine of "apparent scope of authority" has no application in tort cases unless there has been a reliance upon apparent authority which caused the injury. *Curtis Circulation Co. v. Henderson*, 232 Ark. 1029, 342 S.W.2d 89 (1961). The negligent disposal has nothing to do with a reliance upon an apparent authority. As such, the doctrine is inapplicable.

Further, as the majority recognizes, Smith's testimony supports the Schmolls' claim that a master-servant relationship existed between Hartford and Smith. This recognition that Smith's testimony supported the factual existence of an agency relationship between Hartford and Smith is itself sufficient to reverse the summary judgment and remand this case for jury trial.

Ironically, there is no factual dispute that Smith was Hartford's agent for purposes of exercising its right to inspection of the dead carcasses prior to their disposal, nor is there a factual dispute that Smith was Hartford's agent for payment of the expenses related to the disposal. Therefore, there is no dispute that Smith had authority from Hartford to act as its agent in relation to the dead cattle in some manner. The disputed issue is the extent of the authority. Whether an agent acts within the scope of his authority is a question of fact for the jury to determine. *Rowland v. Gastroenterology Assocs.*, 280 Ark. 278, 657 S.W.2d 536 (1983); *see also Holt Bonding Co. v. First Federal Bank of Arkansas*, 82 Ark.App. 8, 110 S.W.3d 298 (2003). Accordingly, the summary judg-

ment granted to Hartford should be reversed.

Smith's testimony referenced a conversation with Hartford that included Hartford's inquiry as to the disposal of the carcasses. In its motion for summary judgment, Hartford relies heavily on the absence of any testimony that Hartford specifically instructed Smith in the disposal process. However, Hartford's silence, or failure to instruct in the proper disposal, could lead a fact-finder to conclude that Hartford ratified Smith's disposal method. In *Brady v. Bryant*, 319 Ark. 712, 894 S.W.2d 144 (1995), our supreme court explained that a principal may become liable for its agent's tortuous conduct through ratification:

> It is well settled in Arkansas law that when the principal has knowledge of the unauthorized acts of his agent, and remains silent ... he cannot thereafter be heard to deny the agency but will be held to have ratified the unauthorized acts.... It has been said that the affirmance of an unauthorized transaction may be inferred from the failure to repudiate it, or from receipt or retention of benefits of the transaction with knowledge of the facts.

*Brady*, 319 Ark. at 715, 894 S.W.2d at 146 (citing *Arnold v. All American Assurance Co.*, 255 Ark. 275, 499 S.W.2d 861 (1973)). Although *Brady* involved an agent's unauthorized entrance into a settlement agreement on behalf of the principal, the principle of ratification also applies when the agent's actions are tortious, and ratification may bind the principal for punitive damages. Restatement (Second) of Agency §§ 217(c) & 218 (1957). *See also Gordon v. Planters & Merchants Bancshares, Inc.*, 326 Ark. 1046, 1059, 935 S.W.2d 544, 551 (1996).

The majority's improper mixing and matching of legal concepts in this case

results in an improper disposition of the case that denies the Schmolls their day in court. This denial violates the fabric of our justice system. Article 2, section 7 of the Arkansas Constitution provides in relevant part:

The right of trial by jury shall remain inviolate, and shall extend to all cases at law, without regard to the amount in controversy; but a jury trial may be waived by the parties in all cases in the manner prescribed by law; and in all jury trials in civil cases, where as many as nine of the jurors agree upon a verdict, the verdict so agreed upon shall be returned as the verdict of such jury, provided, however, that where a verdict is returned by less than twelve jurors all the jurors consenting to such verdict shall sign the same.

The right to a jury trial under article 2, section 7 of the Arkansas Constitution is a fundamental right. *Anglin v. Johnson Regional Medical Center*, 375 Ark. 10, 289 S.W.3d 28 (2008). This right extends to all cases that were triable at common law. *Id.* That is, the constitutional right to trial by jury extends to the trial of issues of fact in civil and criminal causes. *Id.* There are issues of fact in this case and the Schmolls have a constitutional right to trial of those factual issues by jury.

Accordingly, I dissent.

HART and HUNT, JJ., join.